UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RICK MADDEN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-0584-LJM-WTL |
| | ) | |
| ROLLS-ROYCE CORPORATION, | ) | |
| ROLLS-ROYCE DEFENSE SERVICES, INC., | ) | |
| VOLT INFORMATION SCIENCES, INC., | ) | |
| DATA SYSTEMS & SOLUTIONS, LLC, and | ) | |
| CDI CORPORATION, | ) | |
| Defendants. | ) | |

## ORDER ON SUMMARY JUDGMENT MOTIONS

This cause is now before the Court on each defendant's, Rolls-Royce Corporation, Rolls-Royce Defense Services, Inc. (collectively, "Rolls-Royce"), Volt Information Sciences, Inc. ("Volt"), Data Systems & Solutions, LLC ("DS&S"), and CDI Corporation ("CDI") (all defendants, collectively, "Defendants"), Motion for Summary Judgment on plaintiff's, Rick Madden ("Madden"), claims against them under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et seq.* ("USERRA"). Madden's claims under USERRA are based on Rolls-Royce's failure to reinstate Madden to his previous position as Process Engineer or Manufacturing Engineer, when he returned from military duty in 2003, and based on Rolls-Royce's failure to reemploy him for positions he applied for subsequent to his return from military service. In addition, Madden claims that DS&S failed to hire him in 2005 because of his membership in the uniformed services. Each defendant denies that its part in these scenarios violated USERRA.

For the following reasons the Court **GRANTS** Rolls-Royce's Motion for Summary Judgment; **GRANTS** Volt's Motion for Summary Judgment; **GRANTS** DS&S' Motion for Summary Judgment and **GRANTS** CDI's Motion for Summary Judgment.

## I. <u>BACKGROUND</u>

### A. THE PARTIES

It is undisputed that at all times relevant to this litigation Madden was a member of the United States Air Force Reserves.  Am. Compl. ¶ 7.  Madden is a resident of the State of Indiana.  *Id.* ¶ 1.

Among other things, Rolls-Royce manufactures gas turbine engines and part for military and commercial aircraft.  Nuckles Aff. ¶ 3.  Rolls-Royce employees approximately 7,000 people in the United States.  *Id.* ¶ 4.  Rolls-Royce has several policies that are relevant to the issues in this case. *Id.* ¶ 5 & Exs. A & B.  Specifically, Rolls-Royce's "Military leave, Deployment & War Zone Guidelines" states, in relevant part:

<u>Notice Required</u>

An employee who served more than 30 days, but less than 181 days, must submit an application for reemployment no later than 14 days after completing his/her period of service, or, if this deadline is impossible or unreasonable through no fault of the employee, then on the next calendar day when submission becomes possible.

<u>Required Documentation</u>

An employee whose military service was for more than 30 days must provide documentation within two weeks of his/her return (unless such documentation does not yet exist or is not readily available) showing the following:

> •   The application for reemployment is timely (i.e. submitted within the required time period)

2

- The period of service has not exceeded five years; and
- The employee received an honorable or general discharge

Nuckles Aff. ¶ 5 & Ex. A.  In addition, Rolls-Royce's employee handbook states, in relevant part:

**Leaves of Absence**   We recognize there may be times when you face special situations that require time away from work.  Through leaves of absence, you can schedule time for short and long-term disability, military service, family and medical leave, jury duty and bereavement.

* * *

**Military Leave**  We support the men and women who serve our country and provide leaves of absence to employees who have military obligations. . . .  You are eligible for reinstatement in accordance with the applicable laws when you return from military leave.  You must, however, seek reinstatement within the time limits and be qualified to work.

* * *

**Attendance/Tardiness**  Lateness or unexpected absences can disrupt schedules and create hardships for co-workers. . . .  Any failure to report to work that is not due to pre-approved leave or time off is considered an absence.  Excessive absences or tardiness will lead to discipline, up to and including termination of employment.  Absences are considered excessive if they occur frequently or follow a pattern.  For further information, please see your manager.

Nuckels Aff. ¶ 5 & Ex. B.

CDI is a professional services company that offers clients engineering, information technology, and professional staffing solutions.  Duckett Aff. ¶ 2.  CDI provided contract staffing services to Rolls-Royce under an agreement dated January 1, 2000 (the "CDI/Rolls Agreement").  *Id.* ¶ 3 & Ex. A.  The initial expiration date of the CDI/Rolls Agreement was December 31, 2002; however, on January 1, 2003, the agreement was extended to April 30, 2003, and it was thereafter extended until July 31, 2003.  Duckett Aff. Ex. A; *id.* ¶ 4.  Under the CDI/Rolls Agreement, CDI was to provide Rolls-Royce with "temporary contract personnel service needs."  Duckett Aff. Ex. A, ¶

3

2(a). CDI was "authorized to supply contract personnel only upon receipt of an approved [Rolls-Royce] Request Form," and Roll-Royce "retain[ed] the right to accept or reject any and all contract candidates submitted" by CDI. *Id.* ¶ 2(c). Rolls-Royce also "retain[ed] the right to remove any . . . . contract personnel performing under [the CDI/Rolls] Agreement for any reason." *Id.* ¶ 2(a). The CDI/Rolls Agreement also specifically stated that CDI was an independent contractor and not an agent of or joint employer with Rolls-Royce. *Id.* ¶ 4. Rolls-Royce compensated CDI under the agreement only when Rolls-Royce accepted a candidate for an assignment. Duckett Aff. ¶ 13.

Volt is a contingent staffing supplier that provides temporary employees on assignment to its customers nationwide. Herwig Aff. ¶ 3. Volt receives both the job description and the specific screening criteria for each job from its customers. *Id.* ¶ 5. Ultimate determination of a candidate's qualifications for a temporary assignment or direct hire rests solely with Volt's customers. *Id.* Volt is not compensated for its services until and unless a Volt candidate is actually placed on assignment at a Volt customer. *Id.* ¶ 6. In August 2003, Volt entered into a contract with Rolls-Royce to provide staffing services. *Id.* ¶ 9.

Volt maintains a zero tolerance policy that prohibits unlawful discrimination, harassment, and retaliation based on any protected category. Herwig Aff. ¶ 25; Bowlin Aff. ¶ 12. This policy is disseminated to all employees, is posted throughout Volt's facilities, and is noted on Volt's on-line job postings. *Id.* Volt affirmatively recruits military applicants through various direct and indirect sources including participation in "Hire a Hero" programs, job boards, and websites such as "Military.com." Herwig Aff. ¶ 26 & Ex. E; Bowlin Aff. ¶ 13. To Volt, a candidate's military experience is a positive factor particularly for customers that are military contractors, such as Rolls-Royce and Boeing. Herwig Aff. ¶ 27; Bowlin Aff. ¶ 14.

4

DS&S supplies decision support systems to customers in the aviation, defense, energy process industry and transportation markets. Klus Aff. ¶ 4. Its services include engineering, working with high-integrity computer systems, predictive services, and information management. *Id.* DS&S supplies services on a contract basis to Rolls-Royce at its locations in Indianapolis and Plainfield, Indiana. Klus Dep. at 11-12. At all times relevant to this litigation, Robert Klus ("Klus") was in management at DS&S and was the decision-maker with regard to employment of Madden at DS&S. *Id.* at 9; Klus Aff. ¶ 2.


## B. MADDEN'S EDUCATION & RESUME

According to Madden's undated resume he received a bachelor of science degree in aeronautics from Purdue University in December 1994. Rolls-Royce Ex. 15. Madden testified in his deposition that this information was accurate. Madden Dep. at 243-45. Similarly, Madden testified that he graduated from Purdue in December 1994 and majored in aeronautical technology, which is a focus on the design and maintenance of aircraft. *Id.* at 14, 56. Madden testified that he graduated with a GPA of 2.6. *Id.* at 18.

On his New Employee Information Sheet ("NEIS") for Rolls-Royce, presumably filled out prior to his first employment with Rolls-Royce in February 2003, Madden wrote that he had a BS from Purdue in aeronautics with a 3.2 grade point average. Rolls-Royce Ex. 16. Madden testified that he calculated the grade point average on the NEIS himself from a conglomerate of all of his college experience. Madden Dep. at 96-97.

According to Associate Registrar for Records, Registration and Graduation at Purdue University, Debra Sheets ("Sheets"), Madden was scholastically dropped as a student in May 1995,

at the end of the second semester of the 1994-95 academic year.  Sheets Aff. ¶ 6.  According to

Madden's transcript, at the time Madden was dropped from Purdue his cumulative grade point

average was 1.88.  Sheets Aff. ¶ 7 & Ex. A.  Sheets opines that the document provided by Madden

dated December 14, 1994, as proof of Madden's completion of the "Bachelor of Science

Aeronautical Technology Curriculum," is not a diploma issued by Purdue University.  Sheets Aff.

¶¶ 9-10 & Ex. B.  Madden claims that this document was given to him by his former professor,

James R. Rardon, to prove that Madden completed the course requirements for a degree during the

time period that Madden disputed his grades with Purdue.  Madden Aff. ¶¶ 36-37 & Ex. A.

On April 14, 2005, Madden responded to an on-line posting for a position at DS&S by

submitting his resume on-line.  Madden Dep. at 138-39 & Ex. 6.  Madden admitted in his deposition

that at least five items in his work history contained misrepresentations or errors.  Madden Dep. at

24-25, 27-28, 40-42, 69-71.   On April 22 or 23, 2005, Madden completed an application for

employment at DS&S.  Madden Dep. Ex. 7.  The DS&S application stated, in part:

> I hereby authorize Data Systems & Solutions and its subsidiaries or its appointed
> investigative agencies to substantiate and verify my past employment, previous salary
> history, professional credentials, credit standing, academic degrees and any other
> necessary references.  I also authorize my previous schools . . . to release . . . any
> relevant information, including transcripts, that may be requested in connection with
> my employment.

*Id.*  Madden admitted in his deposition that he misrepresented certain salary figures and some

employment history information on the DS&S application.  Madden Dep. at 37-38, 40-42, 71, 147.

In particular, Madden listed his starting pay at his then-current employer, KYB, as $62,000.00 (as

of December 2004), and his salary as of the date of his application as $65,000.00, when in fact

Madden was only making $60,000.00 at KYB as of May 8, 2007.  *Compare* Madden Dep. Ex. 7 *to*

Madden Dep. at 147.  Madden testified that he attempted to "upgrade" his salary on his application. *Id.* at 147.  Later, by affidavit, Madden asserted that the salary figures on the application included pay from his military service.  Madden Aff. ¶ 33.

In connection with his potential employment at DS&S, on May 19, 2005, Madden completed an application for temporary hiring service Innovative Employee Solutions ("IES").  Madden Dep. at 149, 151-52 & Ex. 8.  Again, Madden misrepresented some of his employment history and salary. Madden Dep. at 37, 40-41, 71 & Exs. 6-8.

In addition to his assertion that he intended to include pay from his military service in his salary figures, Madden claimed at his deposition and in his later-filed affidavit that some resume discrepancies were generated by unidentified recruiters to whom Madden gave permission to modify his resume to make it more presentable.  Madden Dep. at 238-39; Madden Aff. ¶ 32.

## C.  MADDEN'S EMPLOYMENT HISTORY WITH ROLLS-ROYCE, CDI & VOLT

Madden first submitted his resume to Volt in August 2002 expressing interest in a temporary position.  Herwig Aff. ¶ 7 & Ex. A.  In November 2002, Volt's Indianapolis, Indiana Branch office submitted Madden's resume to one of its customers, Boeing, for a Flight Test Engineer position. Herwig Aff. ¶ 8 & Ex. A.  Madden's submittal was declined.  *Id.*

During the period that the CDI/Rolls Agreement was in effect, on or about January 24, 2003, Rolls-Royce made a decision to hire a temporary process engineer to work on experimental gas turbine components in Rolls-Royce's manufacturing engineering department.  Savin Aff. ¶ 6. Madden applied for the position that CDI was helping Rolls-Royce staff.  Madden Dep. at 89-91. Madden saw the position on Monster.com and applied for it by submitting his resume.  *Id.* at 90.

Subsequent to that submission, a representative of CDI contacted Madden to conduct a phone interview. *Id.* at 90-91. Madden then had a face-to-face interview with Manufacturing Engineering Supervisor, Robin Savin ("Savin"). *Id.* at 91-93.

During the interview, Savin and Madden discussed the fact that they both attended Purdue. *Id.* at 93. Based on Madden's resume and the interview, Savin believed that Madden had a degree in Aeronautical Engineering. Savin Aff. ¶ 7. At the interview stage, both Savin and CDI explained that if he was hired into a temporary position at Rolls-Royce, his employment would become permanent only if Rolls-Royce still had a need after Madden had worked there for ninety days. Madden Dep. at 101-02. Madden testified that it was Rolls-Royce's decision whether or not Madden would become a permanent employee, and confirmed that Rolls-Royce told him that if he were to go from temporary to permanent employment, it was usually done around the three-month period. Madden Dep. at 99-101 & Ex. 2.

Furthermore, Portia Mason ("Mason"), a then CDI Recruiter, asserts that in the same time period she explained to Madden that CDI's contract with Rolls-Royce was about to expire and that the temporary position would only exist while CDI's contract with Rolls-Royce was still in effect. Masson Aff. ¶ 3. The contract Madden executed with CDI ("CDI/Madden contract") clearly stated this was the case for any temporary employment Madden received through CDI. Madden Dep. Ex. 3. The CDI/Madden contract also stated that "[w]hile working at our Customer's facility, you will follow any work rules, regulations or policies which our Customer may have established." *Id.*

After the interview, Savin decided to hire Madden. Savin Aff. ¶ 8. On or about February 23, 2003, CDI and Madden signed an employment contract through which CDI hired Madden as a

temporary contract employee assigned to fill the position at Rolls-Royce.  Madden Dep. at 97-98 & Ex. 3.  Madden began work at Rolls-Royce on February 25, 2003.  Madden Dep. Ex. 3.

Madden testified that he worked for Rolls-Royce from February 23, 2003, to May 14, 2003. Madden Dep. at 42.  According to Savin, he expects temporary employees to be able to step in and perform their job with minimal training or direction.  Savin Aff. ¶ 21.  Savin does not train or evaluate temporary employees; likewise, Savin does not have evaluation forms for temporary employees.  Savin Dep. at 45, 26.

According to Savin, as a process engineer at Rolls-Royce, Madden's job included writing manufacturing processes on documents referred to as routing sheets.  Savin Aff. ¶ 12.  After the process engineer completes the routing sheets they are given to hourly employees to follow the instructions therein to manufacture various parts.  *Id.*  Both skilled and non-skilled employees have specific tasks and functions they perform in a variety of departments, therefore, it is important that the process engineer correctly explain that the correct departments perform tasks outlined on the routing sheets in he proper order because some tasks cannot be completed until others have already been accomplished.  *Id.* ¶ 13.  When a process engineer incorrectly sequences the process order on the routing sheet, it causes confusion and delay that can shut down production.  *Id.*  In addition, it is important that a process engineer correctly and articulately explain the manufacturing process because a failure to do so may result in parts having to be reworked, or unnecessary scrap or defective parts.  *Id.* ¶ 14.

During Madden's three months at Rolls-Royce, Savin received multiple complaints about Madden's performance.  *Id.* ¶¶ 10 & 11; Savin Dep. at 25.  For example, on a routing sheet, Madden instructed a lathe operator to cut a round part in half, which is a function that a lathe cannot perform.

9

Savin Aff. ¶ 15 & Ex. A.  Savin avows that anyone with the experience Madden claimed to have should have known that a lathe cannot cut a round part in half.  Savin Aff. ¶ 16.  Savin provides two additional examples of Madden's failure to perform.  Savin Aff. ¶¶ 17-18 & Exs. B & C.

Based on these incidents, an others like them, Savin concluded that Madden lacked the basic knowledge required to perform the job.  Savin Aff. ¶¶ 19-20.  Sometime in April or May 2003, Savin decided to terminate Madden's employment.  *Id.* ¶ 22.  Specifically, by the end of Madden's employment at Rolls-Royce, there was insufficient work to justify employment of both Madden and Fred Asay ("Asay"), who was hired at the same time as Madden.  Savin Aff. ¶ 23; Savin Dep. at 32.  Madden acknowledged at his deposition that his and other employees' workload were light toward the end of his employment at Rolls-Royce.  Madden Dep. at 113.  Savin concluded that Asay performed better than Madden, and because he need to eliminate one of their positions, Madden would be discharged because of his performance.  Savin Aff. ¶ 25.

Savin asserts that after he made this decision he attempted to contact Mason at CDI.  Savin Dep. at 33.  However, before Savin spoke with Mason, Madden announced that he was being activated for military duty.  *Id.* at 33-35; Madden Dep. at 110-12.  According to Madden, Savin informed Madden that Savin had to lay off one person in his department and that Madden was going to be that person.  Madden Dep. at 113.  In his deposition, Madden claims that Savin informed him he would be laid off because there was not enough work and that Savin chose Madden because he was leaving for active duty anyway.  Madden Dep. at 112-13.  Madden remained employed at Rolls-Royce until he left for military duty in May 2003 and claims that no one at Rolls-Royce or CDI ever indicated to Madden that his performance was deficient in any way.  Madden Dep. at 42; Madden Aff. ¶ 14; Savin Dep. at 22-35, 44-45, 60-61.

In addition, Madden testified that before he left for military duty he spoke with Mason about the military leave policy.  Madden Dep. at 62 & Ex. 2.  Madden testified that Mason told him that Rolls-Royce, not CDI, was required by law to hold his job for him and to make up the difference in pay.  Madden Dep. at 62-63 & Ex. 2.  According to Madden, when he returned from active duty, CDI issued him a check that made up the difference between his military pay and his salary at Rolls-Royce before his deployment.  Madden Dep. at 63.

Madden testified that he was on military duty from the third week in May 2003, to the first week in July 2003.  Madden Dep. at 44-45.  When he returned from active duty, Madden contacted Mason at CDI and told her that he was available for employment; Mason told him that he had been laid off at Rolls-Royce because of cut backs.  *Id.* at 50-52, 115-16.  According to Mason, as of July 2003, when Madden claims he spoke with Mason, the CDI/Rolls Agreement was about to expire and Rolls-Royce was not accepting any personnel from CDI.  Mason Aff. ¶¶ 7-9 & Ex. 3.  All of Mason's activity with Rolls-Royce at this time was focused on termination of the CDI/Rolls Agreement.  Mason Aff. ¶ 6.  Mason attests that she never spoke with anyone at Rolls-Royce about reinstating Madden when he returned from active military duty in July 2003.  *Id.* ¶ 10.

In his deposition Madden testified that his claim that he was discriminated against on the basis of his military service is directed to Rolls-Royce, not to CDI.  Madden Dep. at 117 & Ex. 2.  In addition, Madden testified that "CDI attempted to find him a job without luck" when he returned from military service.  *Id.* at 134-35 & Exs. 2 & 3.  Madden also testified that CDI made certain he was paid the difference between his military pay and his usual compensation.  *Id.* at 63, Ex. 2.  Madden claims, however, that no one at CDI or Rolls-Royce ever told him that his employment would terminate earlier than in one year, or that his employment could terminate at the end of the

11

contract between Rolls-Royce and CDI.  Madden Aff. ¶¶ 5-7.  Moreover, in his affidavit, Madden attests that he believed his employment with Rolls-Royce was indefinite.  Madden Aff. ¶ 13.

Madden testified that when he returned from military service in late June 2003/early July 2003 he applied for positions at Rolls-Royce through CareerBuilder.com.  Madden Dep. at 50.  He applied for other positions through Monster.com and CareerBuilder.com as well.  *Id.* at 50-51. Apparently he applied for jobs through Volt as well.  *Id.* at 51.

In August 2003, Rolls-Royce entered into a contract with Volt ("Volt/Rolls Agreement") to provide to Rolls-Royce the staffing services previously provided to it by CDI.  Herwig Aff. ¶ 9.

Madden testified that he did not speak to anyone at Rolls-Royce about re-employment there until November 2003.  Madden Dep. at 46-47, 50-51, 58-60.  Madden asserts that, around Thanksgiving 2003, he spoke with Savin regarding a CNC programming position and an open manufacturing engineering position.  *Id.* at 46-47, 50-51, 58-60.  According to Madden, Savin responded by saying that the CNC programming position had been filled and that a degree in engineering was required for the manufacturing engineering position.  Madden Dep. at 59.

Around the same time period, Madden spoke to Juanita Alumbaugh ("Alumbaugh"), who is responsible for college recruiting at Rolls-Royce.  Madden Dep. at 58-60; Alumbaugh Dep. at 5-6. Alumbaugh's job at Rolls-Royce is focused solely on hiring college interns and recent college graduates.  Alumbaugh Dep. at 24-26.  Alumbaugh has no involvement or authority to hire lateral or temporary employees.  Alumbaugh Dep. at 24-26.  Alumbaugh's only role with temporary or lateral-hire employees is that she conducts new employee orientation.  Alumbaugh Dep. at 14-17.

Also around the same time period, in November 2003, Madden submitted an updated resume to Volt that reflected work experience at Rolls-Royce through CDI.  Herwig Aff. ¶ 10.  Based on this

prior experience and Madden's representations regarding his education and engineering experience, on December 3, 2003, Volt submitted Madden's name to Rolls-Royce's hiring manager, Greg Bigler ("Bigler"), for a test production support position. *Id.* ¶ 11 & Ex. A. Bigler spoke to Savin about Madden's previous experience at Rolls-Royce. Bigler Aff. ¶ 11 & Exs. A & B. Savin told Bigler that Madden did not have a degree in engineering and was not a manufacturing engineer as his resume implied. Bigler Aff. ¶ 5 & Ex. A. Savin did not say anything to Bigler about Madden's military service. Bigler Aff. ¶ 6. Bigler's only knowledge of Madden's military obligations is what appears on his resume, which is that Madden is in the Air Force Reserves. Bigler Aff. ¶ 7. After reviewing Madden's job experience and qualifications as they were listed on his resume, and Savin's comments about Madden's performance on the job, Bigler concluded that Madden was not qualified for the test production support position in his area. Bigler Aff. ¶ 9. Bigler selected Michael Murray ("Murray") to fill the test production support position. Bigler Aff. ¶ 10. Murray has a Bachelor of Science in Mechanical Engineering from the University of Maryland. Bigler Aff. ¶ 11. Bigler concluded that Murray's education, job experience and training made him the most qualified person for the job. Bigler Aff. ¶ 10.

According to Volt's records, Bigler declined Madden's resume submittal on the basis of a "poor skill match." Herwig Aff. ¶ 11 & Ex. B. Former Volt Senior Recruiter, Michael Herwig ("Herwig"), relayed the results of the submittal to Madden, but offered to submit Madden's name for another position that appeared to match his skill set. Herwig Dep. at 19-21; Herwig Aff. ¶ 12.

On February 20, 2004, Volt's Herwig submitted Madden's resume to Rolls-Royce's Savin for a process engineer position. Herwig Dep. at 21; Herwig Aff. ¶ 13 & Ex. C. During a telephone conversation on or about that date, Savin informed Herwig that when Madden had worked for Savin

before, Madden's performance was below expectations and that Savin believed that Madden had misrepresented his engineering abilities and education. Herwig Dep. at 21-22; Herwig Aff. ¶ 14. Savin told Herwig that Madden had no degree in engineering. Herwig Dep. at 21-22; Herwig Aff. ¶ 14 & Exs. B & C. Herwig relayed the outcome of this submittal to Madden. Herwig Dep. at 21-22; Herwig Aff. ¶¶ 14-15.

Madden submitted several updated resumes to Volt from June 2004 through October 2004. Herwig Aff. ¶ 16 & Ex. A.

In the fall of 2004, CDI was trying get a contract with Rolls-Royce to start a "Manufacturing Center of Excellence." Duckett Aff. ¶ 10 & Ex. 1. Thus, during that time period CDI interviewed prospective candidates and submitted their resumes to Rolls-Royce. *Id.* On September 16, 2004, CDI Recruiter Bryan Duckett ("Duckett") interviewed Madden and forwarded his resume to Vicky Kroger ("Kroger"), CDI's Engineering Manager. *Id.* ¶ 6. Kroger interviewed Madden the same day. *Id.* Based on his interview with Kroger, CDI submitted Madden's resume to Dick McNeely ("McNeely") at Rolls-Royce for a position in the Manufacturing Center of Excellence. *Id.* However, CDI did not get the contract with Rolls-Royce for the special center; therefore no one that CDI interviewed or submitted to Rolls-Royce for positions in the center were selected. *Id.* ¶¶ 7-11.

Also in 2004, CDI's Duckett contacted Madden about other positions at Rolls-Royce and encouraged him to apply. Madden Dep. at 180. However, CDI did not get the contract to fill these positions. Duckett Aff. ¶¶ 10-11 & Ex. 1.

On October 12, 2004, Volt's San Diego, California, branch office submitted Madden's resume to a San Diego-based customer, Solar Turbines, for a production engineer position. Herwig Aff. ¶ 16 & Ex. A. This submittal was declined by Solar Turbines. *Id.*

Madden provided additional updated resumes to Volt in 2005 and 2006.  Bowlin Dep. at 9; Bowlin Aff. ¶ 5.

In November 2005, CDI re-submitted Madden's resume to McNeely at Rolls-Royce for another position.  Duckett Aff. ¶ 9 & Ex. 1.  However, CDI was not awarded the contract to staff that position, therefore, no one interviewed through CDI was hired.  *Id.*

On December 29, 2005, Volt's former Recruiter, Stacey Bowlin ("Bowlin"), submitted Madden's resume, along with the resume of two other candidates, to Rolls-Royce's hiring manager, Joseph Q. Chu ("Chu"), for a performance engineer position.  Bowlin Aff. ¶ 6 & Ex. A; Bowlin Dep. at 10-11.   Chu rejected Madden's resume because he determined another applicant was more qualified.  Chu Aff. ¶¶ 7, 13, 17.  Bowlin was new to the Rolls-Royce account, therefore, she asked Herwig, who, at the time, was a Senior Lead Recruiter, about Rolls-Royce's expectations for the position and about Madden's prior work experience at Rolls-Royce.  Bowlin Aff. ¶ 7.  Herwig discussed his understanding of Rolls-Royce's expectations, and discussed his understanding of Savin's opinion of Madden's work.  *Id.*; Bowlin Dep. at 11; Herwig Aff. ¶¶ 17-18; Herwig Dep at 39.  Bowlin never spoke with Savin about Madden.  Bowlin Aff. ¶ 10; Savin Aff. ¶ 4.

Madden testified that Bowlin told him in a phone conversation that she had learned that Rolls-Royce did not want to hire him because he had been dismissed because he left for military duty.[1]  Madden Dep. at 52-53, 122-23, 136-37.  By email dated January 16, 2006, Bowlin informed

---

[1]Madden asserts in his affidavit that it was Savin who informed Bowlin of the reason behind Rolls-Royce's May 2003 decision.  Madden Aff. ¶ 23.  This contradicts Madden's deposition testimony where he cannot identify the source of Bowlin's information because she did not say who gave her that information.  Madden Dep. at 52-53, 122-23, 136-37.  To the extent that Madden's testimony is admissible against Volt, the Court will consider only Bowlin's statement about what she learned from Rolls-Royce.

Madden that the submittal to Chu had been declined. *Id.* ¶ 8 & Ex. B. Bowlin told Madden that "the submittal was declined due to the fact that [he had] been there before." Bowlin Aff. Ex. B. Bowlin testified that she did not inform Madden that his previous work performance did not meet Rolls-Royce's expectations, that Madden's skills did not match the engineering position for which his resume had been submitted, and that Rolls-Royce had concluded that Madden had misrepresented his education background, in large part because she did not want to offend Madden and lose him as a candidate for other available positions for which he may have been qualified. Bowlin Dep. at 20; Bowlin Aff. ¶ 9.

During this same time period, several other Volt Recruiters, Steve Paulus ("Paulus"), Andrew Mulis ("Mulis"), and Garrick Cooper ("Cooper"), who came across Madden's resume when they were recruiting for positions at Rolls-Royce, asked Herwig about Madden's qualifications. Herwig Aff. ¶ 19 & Ex. D; Herwig Dep. at 22, 29, 47, 49-50; Paulus Dep. at 23-26. Herwig informed each of these individuals about the statements Savin had made regarding Madden's work performance and Madden's misrepresentation of his educational and professional credentials. Herwig Aff. ¶ 19 & Ex. D; Paulus Dep. at 23-26.

On March 4, 2006, a Volt representative from the San, Diego, California branch office left a message for Madden regarding his resume and availability, however, Madden never called back. Herwig Aff. ¶ 20 & Ex. A.

On or about June 20, 2007, Madden submitted his resume to Volt's Indianapolis branch office for a process engineer position with Volt's customer Raytheon. Nunaley Aff. ¶ 5. A Volt representative communicated with Madden about his interest in the position and about his

professional background and experience. *Id.* ¶ 6.  On July 24, 2007, Volt informed Madden that the customer decided to pursue other candidates for the position.  *Id.* ¶ 7.

Madden was neither employed by Volt nor placed on any Volt temporary assignments. Herwig Aff. ¶ 22; Madden Dep. at 174.

At no time did either Herwig or Bowlin have any direct or indirect knowledge of Madden's concurrent military reserve obligations.  Herwig Aff. ¶¶ 23-24; Bowlin Aff. ¶¶ 11, 15.  The only information Volt had about Madden's military experience was that listed on his resume.  *Id.*

### D.  MADDEN'S EMPLOYMENT HISTORY WITH DS&S

In early 2005, DS&S had a position open for a reliability engineer.  Klus Aff. ¶ 5.  The position required accessing, compiling, and analyzing reliability data on the performance of the T56 turboprop engine, which is used to power a variety of military aircrafts.  Klus Aff. ¶¶ 6-7; Klus Dep. at 14-15.  The position was posted on-line on the Automated Job Opportunities Bulletin Board ("AJOBB") and list "JMO," which stands for "Junior Military Officer," experience as a desired skill. Klus Aff. ¶ 8; Madden Dep. Ex. 13.  On April 14, 2005, Madden responded to the job posting by submitting his resume on-line.  Madden Dep. at 138-39 & Ex. 6.

After reviewing Madden's resume, and noting that Madden was in the Reserves, on April 19, 2005, Robert Klus ("Klus"), conducted a phone interview with Madden.  Klus Aff. ¶¶ 9-10, 24.  Klus considered Madden's military experience a positive attribute.  Klus Aff. ¶ 23; Klus Dep. at 25 & Ex. 2.  During the interview, Madden's involvement in the Reserves was discussed.  Klus Aff. ¶ 11; Klus Dep. Ex. 2, at 73-74.  Klus' contemporaneous notes state, in part: "July - retire from reserves."  Klus

Dep Ex. 2, at 73.  Madden attests that he told Klus he was eligible for retirement because he had twenty years in.  Madden Aff. ¶ 25.

Based on the phone interview, Klus invited Madden for a personal interview on April 21, 2005, with Klus and Alan Hardemon ("Hardemon"), DS&S' then Senior Manager or President. Madden Dep. at 128-29; Klus Dep. at 27-28.  At the interview, Madden's involvement in the Reserves was discussed and Madden and Hardemon spoke of their respective military experiences. Madden Dep. at 129-30.  Based on the qualifications presented by Madden on his resume and during the interview, Klus made the preliminary decision to extend an offer of employment to Madden. Klus Aff. ¶ 14; Klus Dep. at 33-34.  In fact, Klus testified that at that point, Madden was the top candidate and he started the DS&S process to start generating an offer form.  Klus Dep. at 34. Nevertheless, Klus testified that he also interviewed two other candidates after Madden.  Klus Dep. at 34.

Madden completed a DS&S application on April 22 or 23, 2005.  Klus Aff. ¶ 15; Madden Dep. Ex. 7.

At some point prior to finalizing it employment of Madden, DS&S experienced problems verifying Madden's references and employment history.  Klus Dep. at 34-36, 40.  In addition, Klus recalls receiving negative information regarding Madden's performance while he worked at Rolls-Royce, although he cannot say from whom he received this information.  *Id.*  As a result of his difficulty in verifying Madden's references and upon receiving information that Madden's performance might not be up to standard, Klus decided to lessen DS&S' risk by making the reliability engineer position temporary and hiring Madden through an agency.  Klus Dep. at 42-45. The agency DS&S selected was IES.  *Id.* at 45.

18

In mid-May 2005, Klus sent Madden an email explaining his concerns and explaining his decision to hire Madden through IES.  Klus Aff. ¶ 19; Klus Dep. at 75-79.  Klus informed Madden in the email that IES would be responsible for Madden's paycheck and benefits and the arrangement would be effective for approximately six months after Madden started work.  Klus Dep. at 78-79.

Madden completed the IES application on May 19, 2005.  Madden Dep. at 152-53 & Ex. 9.  On May 23, 2005, IES sent an offer letter to Madden.  *Id.*  The offer letter stated that Madden's "assignment with DS&S [was] also contingent upon confirmation of post employment, education credentials and professional reference information [Madden] provided in [his] IES Employment Application."  *Id.*

In an email exchange that began with an email from Madden to Klus on May 24, 2005, Madden asked about his job security and pay in the event that he was called to active duty in September.  Klus Dep. Ex. 2.  Klus responded the next day, writing:

> I was under the impression you were almost done with service.  I will need to know if this is the case since a 90 day void will leave me empty handed again for 3 months.  Not the optimal situation as my customer is without service now for 2-3 months.  This role is not easily backfilled and I need someone that can fill it for a minimum of six months.  My goal being to extend indefinitely.  When is your military commitment officially over?
>
> As for the technicalities behind an activation, I will have to defer to our HR - Karen Lowe.  Karen how would something like this be handled (with Innovative)?

Klus Dep. Ex. 2, at 38-39.  Madden never responded to Klus' email.  Klus Aff. ¶ 27; Madden Dep. at 164-65.

Klus continued to interview other applicants because of the difficulty DS&S had in verifying Madden's references.  Klus Aff. ¶ 20; Klus Dep. at 34-36, 83-84 & Ex. 4.  On May 23, 2005, Klus

interviewed Alastari Molbrey ("Molbrey"), and on May 26, 2005, Klus interviewed Thomas Hankins ("Hankins").  Klus Aff. ¶ 21; Klus Dep. at 83-84 & Ex. 4.

Eventually, Klus hired Hankins for the position.  Klus Aff. ¶ 22; Klus Dep. at 84.  Hankins earned both a B.S. in Mathematics and a B.S. in Engineering Science and Mechanics from Virginia Polytechnic Institute, and graduated magna cum laude.  Klus Aff. Ex. A.  This information was verified pursuant to DS&S' established policy and practice.  Klus Aff. Exs. A & B.

Klus' interview log states the reason for Klus' rejection of Madden was "[t]oo many issues," which Klus explained in his deposition referred to DS&S' problems in contacting Madden's references and the negative performance reference from Rolls-Royce.  Klus Dep. at 34-36 & Ex. 4.

DS&S asserts that because DS&S verifies education of applicants, it would have discovered the fallacy in Madden's resume and applications regarding his degree from Purdue had DS&S continued to pursue Madden instead of Hankins.  Klus Aff. ¶¶ 30-31.

## II.  STANDARDS

### A.  SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is the "put up or shut up" moment in a lawsuit.  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), *reh'g denied*.  Once a party has made a

properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969

F.2d 278, 281 (7ᵗʰ Cir. 1992).  "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7ᵗʰ Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## B.  USERRA STANDARDS

One of the purposes of USERRA is to "prohibit discrimination against persons because of their service in the uniformed services."  38 U.S.C. § 4301(a)(3).  To that end, the relevant portion of the statute provides:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied . . . any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a).

An employer is considered to have engaged in actions prohibited under § 4311(a) if, among other things, a person's "membership" or "obligation for service in the uniformed services" is a "motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . or obligation for service."  *Yates v. Merit Sys. Protection Bd.*, 145 F.3d 1480, 1483 (Fed. Cir. 1998), *citing* 38 U.S.C. § 4311(c)(1).

A "benefit of employment" is broadly defined to include "any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance

coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment." 38 U.S.C. § 4303(2). "This language makes clear that the 'benefit of employment' that cannot be lawfully deprived by an employer is one that flows as a result of the person's employment by the employer in question." *Thomsen v. Dep't of the Treasury*, 169 F.3d 1378, 1381 (Fed. Cir. 1999).

To establish a claim under USERRA, Madden has the initial burden of showing by a preponderance of the evidence that his military service was a "substantial or motivating factor" in the adverse employment action. *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001). If Madden meets that burden, the employer then must come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason. *Id.*

USERRA also prohibits employers from taking "any adverse employment action against any person because such person . . . has exercised a right provided for" under USERRA. 38 U.S.C. § 4311(b)(4). *See also Gagnon v. Sprint Corp.*, 284 F.3d 839, 853 (8th Cir. 2002) (stating that this section sets out the standard for retaliation claims under USERRA). An employee is considered to have "exercised a right" "whenever he seeks reemployment after complying with the requirements of [38 U.S.C. § 4312]." *Wallace v. City of San Diego*, 479 F.3d 616, 625 (9th Cir. 2007).

With these standards in mind, the Court considers Madden's claims.

# III. <u>DISCUSSION</u>

## A. CDI'S MOTION FOR SUMMARY JUDGMENT

Madden asserts that CDI violated USERRA when it refused to have him reinstated at Rolls-Royce in July 2003 or find him other placement at that time, and when it refused to do both of those things when he returned from active duty in late 2003. CDI asserts that there is no dispute that Rolls-Royce made the decision not to reinstate Madden and that CDI could not reinstate Madden at that time because the CDI/Rolls Agreement was set to expire and Rolls-Royce was not accepting applicants from CDI at that time. In other words, CDI was not the decision-maker with respect to Madden's reemployment at Rolls-Royce and changed circumstances made it impossible for CDI to submit Madden's resume to Rolls-Royce. Moreover, CDI asserts that Madden admits that CDI did not deny him a position because of his military service and that CDI tried to find Madden a job.

The Court agrees with CDI that Madden has failed to establish a material question of fact on his USERRA claim against CDI. There is no question that Savin at Rolls-Royce, not Mason at CDI, made the decision to terminate Madden's employment at Rolls-Royce in May 2003. Moreover, there is no question that in July 2003, assuming Madden made an inquiry of Mason about reinstatement at Rolls-Royce at that time, Rolls-Royce was not accepting placements from CDI because the CDI/Rolls Agreement was set to expire. As a result, Madden's reemployment at Rolls-Royce through CDI was impossible or unreasonable at that point in time, which is enough to insulate CDI from liability under USERRA. 38 U.S.C. § 4312(d)(1)(A) ("An employer is not required to reemploy a person under this chapter if–(A) the employer's circumstances have so changed as to make such reemployment impossible or unreasonable . . . ."). Furthermore, Madden testified that CDI did not retaliate against him because of his military duty and that CDI tried to find him other

24

positions, without luck.  Madden Dep. at 117, 134-35.  That CDI tried to find Madden employment at other companies is confirmed by Duckett's affidavit.  Duckett Aff. ¶ 12.

For these reasons, the Court **GRANTS** CDI's Motion for Summary Judgment.

### B.  VOLT'S MOTION FOR SUMMARY JUDGMENT

Madden claims that Volt violated USERRA by refusing to consider submitting his resume to Rolls-Royce because of his military service.  Madden asserts that in January 2006 Bowlin told him that Rolls-Royce's Savin had told Bowlin that Rolls-Royce would not consider employing Madden because of his activation in May 2003.  Madden argues that Volt failed to submit Madden's resume to Rolls-Royce thereafter because of his military status.

Volt asserts that Madden's claim regarding Bowlin's statements are hearsay and contradictory to other evidence in the record, including Madden's deposition testimony in which he admits that he did not know who Bowlin may have spoken with at Rolls-Royce about the reason he was not reemployed by Rolls-Royce after his May 2003 military service.  Even assuming the truth of Bowlin's statement, there is no material question of fact that the Rolls-Royce decision-maker with respect to the specific job for which Bowlin had submitted Madden's resume was neither Bowlin or Savin, it was Chu.  There is no evidence that Chu made his decision not to hire Madden because of his military service.  Moreover, there is no evidence that Volt failed to submit Madden's resume for positions for which he was qualified because of his military service.

The Court agrees with Volt that Madden has failed to establish his USERRA claim against Volt.  First, even if Bowlin's statement regarding Rolls-Royce's reasons for not wanting to hire Madden is admissible against Volt, at best the statement implies an unlawful reason behind Rolls-

Royce's objections to employment of Madden; there is nothing in the statement to suggest that Volt made a decision not to submit Madden's resume because of his military service. To the contrary, Volt submitted Madden's resume to Chu and, subsequently, to other decision-makers for consideration. Madden Dep. at 134, 136, 200-01, 204-05; Herwig Aff. ¶¶ 3-8, 11-16; Bowlin Aff. ¶¶ 6-9; Nunaley Aff. ¶¶ 5-7.

For these reasons, the Court **GRANTS** Volt's Motion for Summary Judgment.

### C.  ROLLS-ROYCE'S MOTION FOR SUMMARY JUDGMENT

Madden alleges that Rolls-Royce violated USERRA in three ways: (1) Rolls-Royce laid him off in May 2003 because of he had been called back for active military duty; (2) Rolls-Royce refused to reemploy him after his military service in July 2003, and subsequently, because of his military service; and (3) Rolls-Royce retaliated against him by refusing to reemploy him and by hindering his ability to seek employment elsewhere because of his military service.

Rolls-Royce contends that paragraphs 5, 9, and 23 of Madden's affidavit are inadmissible because they are hearsay or the matter contained therein is outside Madden's personal knowledge and paragraphs 16, 17, and 19 of Madden's affidavit are inadmissible to the extent they are inconsistent with his previous deposition testimony. In addition, Rolls-Royce asserts that Madden has failed to create an issue of fact on his reinstatement claim because he did not timely seek reinstatement in July 2003 and because Madden could not reasonably believe that he was a permanent employee, which is the only type of employee who is covered under USERRA. Furthermore, Rolls-Royce asserts that Madden's improper discharge claim fails because there is no admissible evidence that Madden was laid off because of his military status. Rather, Rolls-Royce

26

laid off Madden because he failed to perform adequately the functions of his job.  Even if Madden

has provided enough evidence to make a prima facie case of discrimination, Rolls-Royce asserts that

it did and would have made the decision to terminate Madden's employment regardless of his

military activation.

First, the Court agrees with Rolls-Royce that paragraphs 9 and 23 of Madden's affidavit are

inadmissible hearsay.  In paragraph 9, Madden asserts that "Fred Asay ("Asay") informed me that

employees working under the [CDI/Rolls Agreement] were not terminated at the end of that contract

but continued working for Rolls-Royce under the Volt contract."  This is an out-of-court statement

used to prove the truth of the matter asserted.  Similarly, in paragraph 23, Madden attests:  "I

contacted recruiter Stacey Bowlin of Volt to determine why I continued to have no success and she

told me Volt was not going to send my resume to Rolls-Royce any longer because Bob Savin told

her Rolls-Royce did not want to hire me because I had taken military leave."  There are two out-of-

court statements in this paragraph; the statement about what Bowlin said is clearly hearsay as to

Rolls-Royce because there is no agency relationship between Bowlin and Rolls-Royce with respect

to the matters in the statement.  Moreover, Madden offers no reason to admit these statements other

than for the truth of the matters asserted therein.  As a result, paragraphs 9 and 23 of Madden's

affidavit are inadmissible.

Paragraph 5 of Madden's affidavit states:  "I worked with many contract employees at Rolls-

Royce who had either been hired by Rolls-Royce immediately or had remained contract employees

for close to a decade."  Madden provides no foundation for how he knew this information or who

those individuals were; therefore, the matters are outside Madden's personal knowledge and must

be stricken.

The Court also agrees with Rolls-Royce that the statements in paragraphs 16, 17, and 19 of Madden's affidavit should be struck because they are inconsistent with his deposition testimony. Madden claims in his affidavit:

16.     I was continuously on active duty from May 24, 2003[,] until December 22, 2003.

17.     I volunteered to return from leave in July of 2003 due to an excess of servicemen and did return for less than a week in July 2003.

* * *

19.     Upon being notified that I was laid off, I returned under the same activation orders and remained activated until December 22, 2003.

Madden Aff. ¶¶ 16, 17, 19.  However, in his deposition, Madden testified as follows:

Q:     So is it accurate to say that you were deployed from the third week of may to the first week in July?
A:     Correct.

Q:     How many days were you on active duty?

A:     I don't remember exact dates.

Q:     Two months, basically?

A:     Basically.

Q:     So somewhere between [sixty] and [ninety] days?

A:     Correct.

Q:     Where did you work once you got back from active duty in July of 2003?

A:     I didn't.

* * *

28

Q:     When was your first job after you returned in July of 2003?

A:     I didn't work that year, the rest of the year.  I'm sorry, I take that back.  I was activated in - - in October 2003.

Q:     Did you work between July and October 2003?

A:     No.

Q:     . . . What week in October 2003 were you activated again?

A:     Third week.

Q:     When did you return?

A:     November.

Q:     When in November?

A:     It would have been the second week in November.

Madden Dep. at 45-46.  In his deposition, then, Madden states that his military service dates were from May to July 2003, a period of sixty to ninety days, and from the third week in October 2003 to the second week in November 2003, a period of less than sixty days.  Madden makes no argument that he was not allowed to make corrections on an errata sheet or that he has authenticated military documents to prove his dates of service were actually something different than those he testified to in his deposition.  The law on this issue is clear, Madden cannot create an issue of fact by raising something in an affidavit that contradicts his prior sworn testimony.  *See Darnell v. Target Stores*, 16 F.3d 174, 176-77 (7th Cir. 1994).  As a result, paragraphs 16, 17, and 19 of Madden's affidavit are inadmissible.

Next, as to the merits of Madden's claims against Rolls-Royce, the Court finds that summary judgment is appropriate in Rolls-Royce's favor.  On the admissible facts, no reasonable juror could

29

conclude that Madden was a full-time employee at Rolls-Royce in 2003 as that term is used to impose reemployment obligations on employers under 38 U.S.C. § 4312.  Section 4312 exempts employers from reemployment obligations to temporary employees.  There is no dispute that the CDI/Rolls Agreement provided that CDI was to provide Rolls-Royce with "temporary contract personnel service needs."  Ducket Aff. Ex. A, ¶ 2(a). Madden himself testified that the Rolls-Royce position was temporary and would only become permanent if Rolls-Royce still had a need after ninety days.  Madden Dep. at 99-102 & Ex. 2.  As a result, Madden's claim that Rolls-Royce's failure to reemploy him at any juncture in 2003 was a violation of USERRA is without merit.

With respect to Madden's claim that Rolls-Royce violated USERRA when it terminated his employment in 2003, the Court concludes that there is no issue of fact and summary judgment in Rolls-Royce's favor is appropriate.  Madden offers no evidence to counter Savin's assertion that before Madden informed Savin that he had been activated for military duty Savin had decided to terminate Madden's employment because of Madden's failure to perform to Rolls-Royce's expectations coupled with the need to eliminate one engineer because of lighter work.  Savin Aff. ¶¶ 19-20, 22-23, 25.  Savin left a voicemail message for CDI's Mason to this effect prior to talking with Madden about Madden's leave.  Savin Dep. at 33.  In addition, other than the assertion in his affidavit that Savin never informed Madden that his performance did not meet expectations, there is no evidence to contradict the fact that Madden had made several mistakes during his three months at Rolls-Royce.  Furthermore, Madden's claim that he had no idea that his performance was deficient is belied by his admission that Savin did speak with Madden about his poor performance on at least one project.  Pl's Resp. to Rolls-Royce's Mot. for Summ. J., at 7 (citing Savin Dep. at 26-30, 33-35, 44-45, 60-61).  There is no question that even if the timing of Madden's termination in May 2003

is suspicious and could create a question of fact on Madden's prima facie showing of discrimination, Rolls-Royce has proven its affirmative defense that it would have taken the same action regardless of Madden's military duty.

With respect to Madden's claim that Rolls-Royce retaliated against him by not hiring him for jobs he applied for subsequent to his military leave, the Court agrees with Rolls-Royce that summary judgment in its favor is appropriate.  There is no admissible evidence from which a jury could conclude that Savin, Chu, Bigler, or McNeely decided not to hire Madden because of his military responsibilities.  Rather, the undisputed admissible evidence shows that Chu decided not to hire Madden because other candidates were more qualified.  Chu Aff. ¶¶ 7, 13, 17.  Similarly, Bigler decided not to hire Madden because other candidates were more qualified, and because when Bigler checked with Savin, Savin indicated that Madden's performance had been inadequate.  Bigler Aff. ¶¶ 5-7, 9, 11 & Exs. A & B.  Furthermore, McNeely did not consider Madden because he received his resume through CDI with whom Rolls-Royce did not contract at that time for services. Ducket Aff. ¶¶ 6-11 & Ex. 1.

In addition, there is no admissible evidence to show that Savin's decision to not hire Madden was based on anything other than Savin's first-hand knowledge of Madden's work performance and Savin's knowledge that Madden did not have a degree from Purdue as it appeared on Madden's resume.  Herwig Dep. at 21-22; Herwig Aff. ¶¶ 14-15; Madden Dep. at 46-47, 50-51, 58-60.  The fact that Savin informed Herwig and other individuals about the discrepancy in Madden's resume is not evidence that Savin discriminated against Madden because of his military service.

For these reasons, the Court **GRANTS** Rolls-Royce's Motion for Summary Judgment.

## D.  DS&S' MOTION FOR SUMMARY JUDGMENT

Madden asserts that DS&S failed to hire him in 2005 because of his military service based on Klus' email expressing concern about Madden's military leave issues and on the timing of DS&S' withdrawal of its offer to Madden after it learned about Madden's pending leave.  DS&S asserts that the undisputed facts show that DS&S' decision regarding Madden was not motivated by his military service but from frustration at being unable to reach Madden's references.  Moreover, even if there is enough circumstantial evidence for a jury to conclude that DS&S' decision was partially motivated by Madden's military status, there is no question of fact that DS&S would not have hired Madden regardless of his military status because it would have discovered that Madden did not have a degree from Purdue as stated in multiple documents submitted by Madden and DS&S would have rejected him for this deception.

The Court concludes that Madden's claim against DS&S fails.  Even if Klus' concerns about Madden's military commitment and the timing of Klus' decision to hire Hankins instead of Madden for the reliability engineer position were enough to establish a prima facie case under USERRA, there is no evidence from which a reasonable jury could conclude that DS&S would have hired Madden when it discovered that Madden had misrepresented on several application documents that he had a degree from Purdue.  Despite Madden's protestations to the contrary, Madden testified at his deposition that he put his resume together and that the information contained therein about his degree from Purdue was accurate.  Madden Dep. at 243-45.  His later-filed affidavit does not change the facts of those admissions because he never states that anyone else changed that aspect of his resume or the applications he completed for DS&S and/or IES.  Madden Aff. ¶¶ 31-33.  Even if his affidavit did state an alternative fact on that issue, it would be inadmissible because it is contrary to

his prior sworn testimony.  *See Darnell v. Target Stores*, 16 F.3d 174, 176-77 (7th Cir. 1994).

Moreover, there is no evidence to suggest that Madden actually has a degree from Purdue; rather,

the incontrovertible evidence is that Madden attended Purdue, but never graduated or received a

Purdue-sanctioned diploma.  Sheets Aff. ¶¶ 6-7, 9-10 & Exs. A & B.  DS&S presented evidence that

it was standard procedure to check an applicant's education claims; Madden was even on notice that

his employment with either IES or DS&S was contingent on an education credential check.  Klus

Aff. ¶ 15, &. Exs. B & C; Madden Dep. at 152-53 & Exs. 7 & 9.  This evidence is even more

persuasive in light of the fact that  Klus told Madden that DS&S was having difficulty checking his

references and by the fact that Klus started interviewing other candidates for the position because

of that difficulty.  Klus Dep. at 34-36, 40, 75-79; Klus Aff. ¶ 19.  The only reasonable inference is

that DS&S would have discovered the discrepancy in Madden's resume and refused to hire him for

that reason.

For these reasons, the Court **GRANTS** DS&S' Motion for Summary Judgment.

33

## IV.  CONCLUSION

For the reasons stated in this Order, the Court:  **GRANTS** Data Systems & Solutions, LLC's, Motion for Summary Judgment (Docket No. 109); **GRANTS** CDI Corporation's Motion for Summary Judgment (Docket No. 112); **GRANTS** Volt Information Sciences, Inc.'s, Motion for Summary Judgment (Docket No. 114); and **GRANTS** Rolls-Royce Corporation's and Rolls-Royce Defense Service's Motion for Summary Judgment (Docket No. 117).  Plaintiff's, Rick Madden, claims are **DISMISSED with prejudice**.  Judgment shall enter accordingly.  Each party to bear its own costs.

IT IS SO ORDERED this 18th day of March, 2008.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

William L. O'Connor
DANN PECAR NEWMAN & KLEIMAN
woconnor@dannpecar.com

Mark Richard Waterfill
DANN PECAR NEWMAN & KLEIMAN
mwaterfill@dannpecar.com

Todd J. Kaiser
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
todd.kaiser@odnss.com

Brian L. McDermott
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
brian.mcdermott@odnss.com

Tracy Ann Miller
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
tracy.miller@ogletreedeakins.com

Brandon M. Shelton
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
brandon.shelton@ogletreedeakins.com